SMITH, APPELLANT, *v.* SMITH ET AL., RESPONDENTS.

(No. 3,142.)

(Submitted May 25, 1912. Decided June 10, 1912.)

[125 Pac. 987.]

*Equity—Estates of Deceased Persons—Minors—Executors and*
*Administrators—Guardian and Ward—Conspiracy—Fraud—*
*Sales—Setting Aside—Evidence—Insufficiency.*

Executors and Administrators—Guardian and Ward—Fraud—Sales—Setting
Aside—Evidence—Insufficiency.

1.   Plaintiff's father willed his property, consisting of stock in a
sheep company of which he and his brother were the principal owners,
to his minor children.   The property thus disposed of was inventoried
at $61,475.   His executor, an attorney at law and nephew of testator,
obtained an order of court authorizing him to sell the stock for not
less than $75,000.   Efforts to sell were unavailing.   Thereafter testa-
tor's brother bought the stock for $85,000, borrowing the purchase
money from a bank.   The sale was confirmed and the buyer appointed
guardian of the minors.   The executor having turned over to him, as
guardian, the funds thus realized, they were used by him to liquidate
his indebtedness to the bank, obtaining an order permitting him to
borrow the money of his wards about a year later.   In an action by
one of the beneficiaries under the will, evidence examined and *held*
not to disclose such alleged illegal and fraudulent transactions in aid of
a conspiracy between the executor and the purchaser (guardian of the
minors), as to warrant a court of equity to set aside the sale.

Same—Larceny—Evidence—Insufficiency.

2.   Where a guardian who had given ample security to account for
all funds coming into his hands as such and who was personally able
to raise the amount thereof on demand, under a misapprehension that
he had a right to do so, temporarily employed guardianship funds to
repay a loan, thus technically appropriating them to his own use, he
nevertheless could not be adjudged guilty of larceny under section
8656, Revised Codes, especially where at the settlement of the estate
he fully accounted for all moneys paid over to him as guardian.

*Appeal from District Court, Meagher County; W. R. C.*
*Stewart, Judge of the Ninth Judicial District, presiding.*

ACTION by William J. Smith against Mary M. Smith, as execu-
trix of the last will and testament of John M. Smith, deceased,
and others.   From a judgment in favor of defendants and an
order denying his motion for a new trial, plaintiff appeals.
Affirmed.

*Mr. William Scallon, Mr. T. J. Hoolan, Mr. T. E. Nolan,* and *Messrs. Walsh & Nolan,* for Appellant, submitted an original as well as a reply brief; *Mr. T. J. Walsh* argued the cause orally.

The basic question of law presented by this record is this: Can one who casts covetous eyes on the property of orphan minors in the hands of the executor of their ancestor, conceive of a plan to have himself appointed guardian of their estate, buy the property of the executor, make a temporary loan to obtain the money to pay him, get the same back into his hands from the executor as guardian in trust for the wards, and use it to pay off his notes witnessing the loan, and, successfully carrying out the plan thus conceived, justify the sale in a suit in equity brought by the minors to avoid it?

The whole plan to acquire the stock was fraudulent and criminal. Equity must frown upon the proceeding, however it may have eventuated in this case, as one calculated to rob the orphan of his heritage. It is the tendency of such a procedure to permit the despoiling of the weak wards of chancery that condemns it, even though in the individual case it may have been entered upon with the most praiseworthy motives, and a fair or even liberal consideration for the property was paid. The project conceived for the acquisition of this stock involved, and the fulfillment of it resulted in, the larceny of the guardianship funds (sec. 8656, Rev. Codes), and it is entirely immaterial that he intended to restore the funds he appropriated. (*Commonwealth* v. *Tenney,* 97 Mass. 50; *United States* v. *Gibert,* Fed. Cas. No. 15,204, 2 Sum. 19; *Spalding* v. *People,* 172 Ill. 40, 49 N. E. 993; *Farmer* v. *State* (Tex. Cr.), 34 S. W. 620; *People* v. *Warren,* 122 Mich. 504, 80 Am. St. Rep. 582, 81 N. W. 360.) It was expressly declared in *Cummings* v. *Strobridge,* 150 Cal. 209, 119 Am. St. Rep. 189, 88 Pac. 901, that the "borrowing" by a guardian of the funds of his wards in his hands constitutes embezzlement. It is elemental that a trustee cannot loan the trust funds to himself with or without security. (1 Perry on Trusts, 453, 461; *In re Petrie,* 5 Dem. Sur. (N. Y.) 352; *In re Jones,* 5 Dem. 499, 10 N. Y. St. 176.) The statute expressly forbids it. (Sec. 5376, Rev. Codes.)

This is in accordance with a universally recognized rule expressed in a note to *Schmidt* v. *Shaver,* 89 Am. St. Rep. 250, citing *Porter* v. *Tudor,* 9 Conn. 411; *McConnell* v. *Hodson,* 7 Ill. 640; *Bevis* v. *Heflin,* 63 Ind. 129; *Thomas* v. *Hite,* 5 B. Mon. (Ky.) 590; *Atkinson* v. *Atkinson,* 8 Allen (Mass.), 15; *Baughn* v. *Shackleford,* 48 Miss. 255; *State* v. *Tittman,* 54 Mo. App. 490; *Johnson* v. *Payne & Williams Bank,* 56 Mo. App. 257; *Evertson* v. *Evertson,* 5 Paige Ch. (N. Y.) 644; *Field* v. *Schieffelin,* 7 Johns. Ch. (N. Y.) 150, 11 Am. Dec. 441; *Lancaster* v. *Allen,* 1 Head (Tenn.), 326; *Dobyns* v. *Rawley,* 76 Va. 537.

John M. Smith was disqualified from purchasing. It is almost universally admitted in the law of guardianship that a guardian cannot purchase the estate of his wards and that any purchase of their property by him may be avoided or regarded as in trust for them as they may elect. The rule, which is a general one and applicable to all trustees (sec. 5376, Rev. Codes), finds expression in a direct provision of the statute as to executors and administrators. (See sec. 7599.) If the guardian can buy at all, he can become the purchaser only by virtue of an order of the court specifically authorizing him, upon a showing made. So the statute says, and it but expresses the rule of equity declared by the supreme court of the United States in *Michoud* v. *Girod,* 4 How. (U. S.) 503, 11 L. Ed. 1076. The reason for the rule denying to trustees the right to buy the trust property was probably never better expressed than by Chancellor Kent in *Davoue* v. *Fanning,* 2 Johns. Ch. (N. Y.) 252, or more forcibly sustained than by Justice Wayne in the case of *Michoud* v. *Girod, supra.* The right of a guardian to buy in his own interest at a surrogate sale is denied by the court of appeals of New York in *Bostwick* v. *Atkins,* 3 N. Y. 53. A purchase by a guardian at a tax sale of his ward's property was held void in *Dohms* v. *Mann,* 76 Iowa, 723, 39 N. W. 823. This doctrine is regarded as fundamental in the law of tax titles. (Black on Tax Titles, 275; see, also, *Martin* v. *Wyncoop,* 12 Ind. 266, 74 Am. Dec. 209; *Brockett* v. *Richardson,* 61 Miss. 766; *Jewett* v. *Miller,* 10 N. Y. 402, 65 Am. Dec. 751; *Spindler* v. *Atkinson,* 3 Md. 403, 56 Am. Dec. 755; *Collins* v. *Smith,* 38 Tenn. 251.)

John M. Smith was disqualified from purchasing, though he was not at the time *de jure* guardian. He had applied for letters of guardianship, and his application was pending. Can it be that one who is actually prosecuting an application for his own appointment as guardian of minors is at liberty to purchase the trust estate? Every reason that operates to disqualify him after the order appointing him is made is equally existent and forceful after he has applied for letters. By the very act of applying he has put himself in an attitude of concern in and care for the interests of the minors. A guardian *de son tort* is as much disqualified as one who is regularly appointed and qualified. (*Town of Thornton* v. *Gilman,* 67 N. H. 392, 39 Atl. 900; 1 Perry on Trusts, 245.) A *quasi* guardian is equally forbidden to purchase. (1 Perry on Trusts, 204; Woerner on Guardianship, 297; *Hindman* v. *O'Connor,* 54 Ark. 627, 13 L. R. A. 490, 16 S. W. 1052.)

It perhaps need not be said that confirmation of the sale does not cure any defect in it resulting from the incapacity of the purchaser to buy (*Brown* v. *Nelms,* 86 Ark. 368, 112 S. W. 373); nor that the order permitting John M. to borrow the funds of the estate would not operate retroactively, even if it had any validity at all to legalize his former misappropriations (*Hendee* v. *Cleaveland,* 54 Vt. 142); nor that no attention can be paid to any testimony about any private talks with the judge about the matter. (*Id.; O'Brien's Estate,* 80 Neb. 125, 113 N. W. 1001.)

*Mr. L. O. Evans, Messrs. McIntire & McIntire,* and *Mr. R. Lee Word,* submitted a brief in behalf of Respondents. *Mr. Evans* and *Mr. Word* argued the cause orally.

John M. Smith's use of the guardianship funds was neither criminal nor fraudulent in fact. "You must remember that the burden of proof is on the party who alleges fraud. That fraud, though proved by circumstances, can never be presumed—for fraud is a crime. It is not enough to show suspicious circumstances. Suspicion is not proof. It does not require a great deal of ingenuity to cause suspicion of fraud upon any transac-

tion. There is a very great and sometimes grievous error into which not only the public mind, but that of the jurors and judges, too, are apt to fall; and which leads to false judgments and sometimes to great oppression. * * * In the midst of our virtuous indignation against fraud, we first assume it has been committed, and then seek for arguments to confirm, not our judgments, but our prejudice. 'Trifles light as air,' then become 'strong as proofs of holy writ.' Circumstances which to an unprejudiced mind are just as compatible with innocence as guilt; which at best can only raise a suspicion, are set down as conclusive evidence of crime. * * * We suffer our imaginations to take the reins from our judgments, and rush headlong in this chase after the fox called fraud. Circumstances which should avail for the proof of the fraud are such only as are inconsistent with a contrary view of the transactions, and lead irrisistibly to that conclusion." (*Turner* v. *Hand,* Fed. Cas. No. 14,257, 3 Wall. Jr. 88.) When men have passed the meridian in life their habits have become fixed. The habit of honesty is persistent. A man always honest does not become a cheat over night. "It cannot be presumed that any man of fair character such as M. Gratz is proved to have been would perpetrate a fraud or deception without some motive that should overbalance all of the ordinary influence of prudence and honor." (*Prevost* v. *Gratz,* 6 Wheat. (U. S.) 501, 5 L. Ed. 311.) Contrary to the statement of counsel for appellant, we have no right to assume fraud at any time, much less to read it into a letter (the "lost letter") confessedly not in evidence. (*Ames* v. *Gilmore,* 59 Mo. 537; *Morris* v. *Talcott,* 96 N. Y. 100; *Farrar* v. *Churchill,* 135 U. S. 615, 34 L. Ed. 246, 10 Sup. Ct. Rep. 771.) "Fraud cannot be presumed. It must be proved, and if there is room left for the inference of an honest intent the proof of fraud is wanting." (*Bernheimer* v. *Rindskopf,* 116 N. Y. 436, 15 Am. St. Rep. 414, 22 N. E. 1074, and cases cited; *Gregg* v. *Sayre,* 8 Pet. (U. S.) 244, 8 L. Ed. 932; *Gaines* v. *Nicholson,* 9 How. (U. S.) 356, 13 L. Ed. 173.)

Had John M. been a trustee when he purchased, yet under the facts he was not disqualified from purchasing. In *Allen* v.

*Gillette,* 127 U. S. 589, 32 L. Ed. 271, 8 Sup. Ct. Rep. 1331, the court says: "The principle that a trustee may purchase the trust property at a judicial sale brought about by a third party, which he had taken no part in procuring, and over which he could not have had control, is upheld by numerous decisions of this court and all other courts of this country." (*Fisk* v. *Sarber,* 6 Watts & S. (Pa.) 18; *Prevost* v. *Gratz,* 1 Pet. (C. C.) 364, Fed. Cas. No. 11,406; *Steinback* v. *Bon Homme Mining Co.,* 152 Fed. 339, 81 C. C. A. 441.) In *Lusk's Appeal,* 108 Pa. 159, the court said: "It has been the conceded law of this state, since the case of *Fisk* v. *Sarber,* 6 Watts & S. (Pa.) 18, that at a judicial sale, not controlled by the trustee, the trustee can be a purchaser." To the same effect are: *Starkweather* v. *Jenner,* 27 App. D. C. 348; *Anderson* v. *Messenger,* 146 Fed. 932, 7 L. R. A., n. s., 1094, 77 C. C. A. 179; *Howe* v. *Ball Bearing Co.,* 154 Fed. 820, 83 C. C. A. 536; *Meanor* v. *Hamilton,* 27 Pa. 142; *Hall's Appeal,* 40 Pa. 414; *Earl* v. *Halsey,* 14 N. J. Eq. 332; *Dexter* v. *Harris,* 2 Mason, 531, Fed. Cas. No. 3862; *Barber* v. *Bowen,* 47 Minn. 118, 49 N. W. 684; *Starkweather* v. *Jenner,* 216 U. S. 524, 54 L. Ed. 602, 30 Sup. Ct. Rep. 382.

Under the facts, no trust as to the stock could arise. The question that we will now consider is, whether or not, under the facts, any trust in the stock of the estate bought by John M. Smith in January, 1899, could arise in favor of the plaintiff, because of the fact that after John M. had qualified as guardian, and received from the executor the funds of the estate in his hands, he used these funds in part payment of his notes theretofore given to the bank. That, under these circumstances, no trust of any kind could arise, is clear from the authorities. It is well settled that if a trustee employs the moneys of the *cestui que trust* in making a purchase of lands, and takes to himself the conveyance of the legal estate, by operation of law a trust results to the *cestui que trust,* and a payment of part of the purchase money will to the extent of the payment. But as to the creation of such a trust, Chancellor Kent, in *Botsford* v. *Burr,* 2 Johns. Ch. (N. Y.) 414, uses the following language: "The trust must have been coeval with the deeds, or it cannot exist at all. After a party has made

a purchase with his own moneys or credit, a subsequent tender, or even reimbursement, may be evidence of some other contract, or the ground for some other relief, but it cannot, by any retrospective effect, produce the trust of which we are speaking. There never was an instance of such a trust so created, and there never ought to be, for it would destroy all the certainty and security of conveyances of real estate. The resulting trust, not within the statute of frauds, and which may be shown without writing, is when the purchase is made with the proper moneys of the *cestui que trust,* and the deed not taken in his name. The trust results from the original transaction at the time it takes place, and at no other time; and it is founded on the actual payment of money, and on no other ground. It cannot be mingled or confounded with any subsequent dealings whatever. They are to be governed by different principles, and the doctrine of a resulting trust would be mischievous and dangerous, if we once departed from the simplicity of this rule.'' (*Ducie* v. *Ford,* 138 U. S. 592, 34 L. Ed. 1091, 11 Sup. Ct. Rep. 417; *French* v. *Sheplor,* 83 Ind. 266, 43 Am. Rep. 67.)

In line with the cases above cited, and in support of the principle that under the facts here presented no trust of any kind could arise, we cite in addition to the cases *supra: Denton* v. *Davis,* 8 Ves. 499, 34 Eng. Reprint, 406; *Meredith* v. *Cit. Nat. Bank,* 92 Ind. 343; *Hadley* v. *Stuart,* 62 Iowa, 267, 17 N. W. 500; *Jones* v. *Storms,* 90 Iowa, 369, 371, 57 N. W. 892; *Whitten* v. *Whitten* (Mass.), 3 Cush. 191–200; *Baker* v. *Baker,* 22 Minn. 262; *Mason* v. *Libby,* 54 How. Pr. (N. Y.) 104, 112; *Barnet* v. *Dougherty,* 32 Pa. 371; *Cross' Appeal,* 97 Pa. 471; *Haney* v. *Legg,* 129 Ala. 624, 30 South. 34; *Kisler* v. *Kisler,* 2 Watts (Pa.), 323, 27 Am. Dec. 308; *Maroney* v. *Maroney,* 97 Iowa, 711–717, 66 N. W. 911; *Martin* v. *N. Y. & St. L. M. Co.,* 165 Fed. 398, 91 C. C. A. 348; *Butterfield* v. *Butterfield,* 79 Ark. 164, 9 Ann. Cas. 248, 95 S. W. 146; *Niver* v. *Crane,* 98 N. Y. 40, 47; *Wheeler* v. *Reynolds,* 66 N. Y. 227, 235. That subsequent fraud, if any existed, could not raise a trust in the stock theretofore purchased, is made plain under the following authorities: *Barnet* v. *Dougherty,* 32 Pa. 371; *Wheeler* v. *Reynolds,* 66 N. Y. 235.

MR. JUSTICE SMITH delivered the opinion of the court.

This is a suit in equity, the purpose of which is, in effect, to set aside a sale of 40,983 1/3 shares of the capital stock of the Smith Bros. Sheep Company, made by Napoleon B. Smith, as executor of the last will and testament of William A. Smith, deceased, to John M. Smith in his lifetime, and to obtain an accounting. The plaintiff is a son and one of three heirs at law of William A. Smith, deceased. His two sisters, Annie Maud Kahle, residing in the state of Ohio, and Nellie Mae Moore, a resident of the state of Missouri, are the other heirs at law of their father. A suit, similar to the instant one, was begun in the circuit court of the United States for the district of Montana by Nellie Mae Moore; that court entered a decree in favor of the defendants, which was reversed on appeal by the circuit court of appeals for the ninth circuit, the latter court ordering a decree in favor of the complainant, substantially as prayed for. This cause was tried to the district court of Meagher county, sitting without the aid of a jury. The result was a decree or judgment in favor of the defendants, from which, and an order denying a new trial, the plaintiff has appealed. The action was, by stipulation, submitted to the district court on a printed transcript of the evidence taken in the case of Nellie Mae Moore against the defendants, theretofore heard in the federal court, supplemented by a brief examination of the plaintiff touching the circumstances under which he made settlement with his guardian, John M. Smith, on arriving at his majority. As stated in the brief of counsel for the appellant, "the cause is before this court for determination on identically the same evidence on which it was heard in the circuit court of appeals." We therefore take the following statement of facts from the opinion in that case (see *Moore* v. *Smith,* 182 Fed. 540):

"The record shows that for many years John M. Smith and
[1] William A. Smith, who were brothers, were the owners of a large amount of land in the state of Montana, upon which they carried on the sheep, cattle and horse business. At first they managed the business themselves, but in 1890 they organized

a corporation under the laws of Montana, under the name of Smith Bros. Sheep Company, to which corporation they conveyed all of their property. Each of them was married, and to the wife of each was given 5,000 shares of the capital stock of the company, which amounted to 250,000 shares. The remainder of the stock was divided equally between the brothers. The wife of William A. Smith deserted him in 1891, leaving three small children—the oldest a boy then seven years old, and two younger girls, the older of whom was the complainant in this case and is the appellant here. These children William A. Smith subsequently sent to live with their aunt, a Mrs. Reynolds, in Ohio, who was a sister of the two brothers. Napoleon B. Smith, who was their nephew, was an attorney at law residing at White Sulphur Springs, Meagher county, Montana, in which county most of the property of the brothers was situated, and in which they both resided. William A. Smith died there on February 13, 1897, and on his deathbed made his will, which was drawn by Napoleon B. Smith, by which will he left all of his estate to his three children and appointed his said nephew executor thereof.

"During the course of his examination as a witness, John M. Smith was asked what, if any request, his brother William made of him in his last illness regarding his children, and answered: 'A. The last words that he said to me was, "N. B. Smith is my administrator and he will attend to the affairs in that way, and I want you to look after the interests of my children." Those were the dying words that he said. Q. And did you say you would? A. I said I would, and I have, faithfully.' At the time of his death William A. Smith was the owner of 122,950 shares of the stock of the Smith Bros. Sheep Company—John M. Smith then owning a majority of the stock.

"The case shows that John M. Smith was himself then in poor health, as was his wife, and that in consequence he spent much of his time at Pasadena, California, where he was at the time of much of the correspondence hereinafter referred to. Some time after the business was incorporated one McNaught, who was a brother in law of John M. Smith, became manager of the prop-

erty under the supervision and direction of the latter. The will of William A. Smith was admitted to probate, and Napoleon B. Smith became executor of his estate. After the death of William A. Smith, and because of the age and poor health of John M. Smith, and perhaps from other reasons, both John M. Smith and the executor became desirous of selling the whole property. A sale by John M. Smith of his majority of the stock to a stranger might have worked to the injury of the minority interest of the children of the deceased William A. Smith, so that both John M. Smith and the executor of the estate of William A. Smith became desirous that both interests be sold together. Repeated efforts in that behalf failed of accomplishment.

"On the 23d of November, 1897, McNaught asked for an option of purchase, to run until the end of the year, on all of the property, free of debts, except future payments on certain railroad land contracts, on which application J. M. Smith indorsed this: 'My figures is two hundred and twenty thousand $220,000 Subject to the approvel of Mary Smith (wife of John M. Smith) & N. B. Smith to date from Jan 1, 1892 time to complete sale about to the 10 of Jan. 1898. J. M. Smith.' The executor of the estate of William A. Smith indorsed thereon the following: 'In case a buyer can be found for the property at the amount above stated I will immediately make application to the district court of Meagher county, Montana, to sell the interest of the Estate of W. A. Smith, deceased, in said property at the rate above stated. [Signed] N. B. Smith.'

"The evidence shows that the executor regarded the estimate of John M. Smith as to the value of the property at the time too high, as did others.

"On the 14th of December, 1897, John M. Smith wrote a letter from Martinsdale, Montana, to the executor, which reads in part as follows: 'N. B. Smith Der Sir & Nefue. * * * Mr. McNaught is back from Helena he could not get a party to take hold of the property, but I think the chance will be better next summer I want to sell out so as to go some plase that I can be with my famley & can send Stanley [his son] to school as long as I hold it I can't be sadesfied away from it & I dont want to sell

out & leave the childrens interest in it   I think the coming year will be the time to let gow of the intire plant   you can at the next turm get a permit to sell wills intrest at anney time that we can get fair value for it   then we can go ahead with it when the opertunity Shows up   I think it will be well to arange that the text turm of Court   I dont think that we will sell much befoar next July or Auges but I dew want to sell as soon as we can to advantage   if I was yong I would not cair to sell for it is a good property well managee at what I ask for it.'

"The record shows that on the 24th day of January, 1898, the judge of the probate court made an order based upon the application of the executor, authorizing him to sell all of the 122,950 shares of the stock of the company belonging to the estate of William A. Smith, deceased, 'at private sale and without previous notice, provided that said personal property be sold at a sum not less than seventy-five thousand dollars, and may indorse said stock for the purpose of said sale, and may do all other acts and things requisite and necessary to transfer all of the interest of said estate in and to said stock and the property represented by said stock.   That said stock be present at the time of said sale, and that said executor present to this court at the next. term thereof after such sale, an account of sale, verified by his affidavit.'

"On the 19th of the following March, John M. Smith wrote a letter from Helena, Montana, to the executor, which is in part as follows:

" 'Mr. N. B. Smith   Dear Nefue

" 'I wish to get the least price that you can excep for the children stalk [stock]   I may have to dew some figuering to sell the Plant & in case I knawed fest how much I could drop and pay all debts it would give me a chance to handel my self   what would you give me a opten on the Stock after the debts is payed I think you said the order was for you to sell for $75,000 but we think we can dew better then that   I think I can get them 80 or 85000 out it clear for them   now can you name enney price that

would soat you to give a opchen on so I might have a maregen to mark [work] on   think the matter over & let me know.

"'[Signed]   J. M. Smith.'

"On March 25, 1898, the executor replied as follows:

"'Office of N. B. Smith, County Attorney, Meagher County.
"'White Sulphur Springs, Mont., March 25th, 1898.

"'Dear Uncle: Your letter in regard to the stock of the estate came to hand. I have been thinking over the matter. I think rather than see a sale go bye I would be willing to take $85,000 for the stock. I want to do what is fair by the estate and also by you. I want to see a sale go through in some shape, but at the same time I want to do the best I can for the estate. I would want the $85,000 alone for the stock, and the party who gets the stock to pay all the debts of the company, and also that the sheep company cancel whatever debts it might have against the Alice or Blackhawk Mining Companies.

"'Yours truly,
"'[Signed]   N. B. Smith.'

"On July 2, 1898, John M. Smith wrote to the executor as follows:

"'Smiths Ranch July 2 1898.

"'N. B. Smith   Dear Nefue

"'I have been figerin Since you laft on this Sheep Sale you know that our Judgment difers as to the value of the property you being willen to take less then would satiesfy me & thaught that you would rether than miss a sail would take $80000 for the pert you represent rether then miss a sail   it was on that bases that I made my offer to Mc   My offer gave me a maregen that would sadesfy me but I dont have a small margen it cuts me down so low that I dont feal sadesfiged if I had made my figers with the intent of giving you the benefit of my Judgment I should have plase my figers higher then I did so you can see that your astemate throwed me off in my calculation & will bring me out with less money then is sadesfactery to me & Mary   I told her as you was willing to take less then I thought the stock worth & I was willing to take 80000 that I would have a margin to work

on & best my offer acorded now under theas circumstances I
think you can afoard to take $84000 as your figers estemate 85000
now if I can have a small margen to work on as I don't know jest
what it will take to Squair all debts but I think if I can get yours
at 84,000 that I will still have a small margein to work on if this
deel goes but I would not be sadesfied to take the offer & devide
equel as our Judgment difered as to value I made the offer below
what I should have done if I had not had some aserence that you
would take 80000 for the interest now if you think you can take
84000 I think that will be very close to to it if the sail goes if you
cant aford to take that Mary may not sell her stock & and that will
spoil the sale if enny can be made atall.  let me know at onse
So I cam calculat acorden.

" 'Your uncel,

" 'JOHN M. SMITH.

" 'If we dont sell this time we may get that much.'

"December 30, 1898, came without the effecting of any sale,
although strenuous efforts in that behalf were made by John M.
Smith (to one Miles, among others) as well as by McNaught.   On
the day last mentioned Henry Neill made to the executor the
cash offer of $80,000 for the stock belonging to the estate.   The
next day the executor wrote to John M. Smith this letter:

" 'Office of N. B. Smith, County Attorney, Meagher County,

" 'White Sulphur Springs, Mont., Dec. 31st, 1898.

" 'Dear Uncle: Neill of Helena was in to see me yesterday in
regard to the ranch property.   He wanted an option on my inter-
est.   I told him I could not give it at this time as I had let you
have an option.   If you are figuring on Miles making a trade I
think you had better look for other parties.   Neill thinks he can
sell the property.   I am very anxious to do something with the
property as I feel that the estate is going to lose moncy by hold-
ing it.   Heitman and Danzer have a large number of sheep
feeding in east and it is the prevailing opinion of those who know
that they will lose from 50 cents to a dollar a head on the trans-
action.   Neill said he would make me a cash offer of $80,000 for
the estate's interest in the property.   If you will make me a cash

offer of $85,000 you can have the property. I told Neill I would not make such an offer. McNaught writes me that you now owe the company $13,839.35, and that the company will have to commence borrowing money. If you do not take the stock it would be your duty to put your note in to the company for the amount so that the company could raise the money on the same to carry on the business. Under our law the only money can be drawn out of a company by a stockholder is by declaring so much dividend on each share of stock. I do not make the suggestion to hurt your feelings, but you know yourself that such large transaction should not be carried on in such a loose way. Please let let me hear from you in the matter. We are all well. I wish you all a happy new year. I got a letter from Barnes at your place. Give all the Montana people my best regards.

" 'Your nephew.'

"On the 14th of January, 1899, John M. Smith wrote to Mr. George L. Ramsey, cashier of the Union Bank & Trust Company, Helena, Montana, this letter:

" 'Pasadena, Cal., Jan. 14, 1899.
" 'Mr. George L. Ramsey Helena Mont.

" 'Would your bank lone ninty thousand dollars to me a& take the entire stock of the Smith Bros Sheep Co as security. I consider it gilt edge I am about to buy the estates intrest I will onley want it ontell I can make a sale of the property perheps 4 or 5 months Wire me your lowest rate of intrest & if I can get it wire at my expense all the compny owes is the $2000—that I sent the Note for the othr day,

" 'Yeus Truly
" 'J. M. Smith.'

"Two days thereafter, to-wit, January 16, 1899, John M. Smith wrote from Pasadena, California, to the executor at White Sulphur Springs, Montana, as follows:

" 'N. B. Smith   Dear Nefue   W. S Springs   I wired you that I would except your offer for the Stock of the Sheep plant beloning to the children I have not herd from Miles yet if he makes a raise I will pay you the $90000 if he fails I will give you

the $85000 that you aske you of corse would put it in goveoment bonds if you had it now to make things safe & you be absolutly safe I will give you all of the Sheep Company Stock to hold as security for the payment of the $85000 & I will pay the same interst that you would get on Gov bonds & pay you 3 times per year ontill I can sell out to advantage then you will be safe & if enny one is looser it will be me & I am willing to take the chances they never will be a time but what the hole business will bee the best security for that amount but I dont intend to hold it very long at enny time that I can make a good sale I will pay off your $85000   I think this the best way for us to close up business   I intend never to run less than 40000 head of sheep on the ranch as long as I have ennything to dow with it by you holding all the stock as Security no one could com in ontill your Note is payed first I never tried to get in debt much enny more as I intend to keep close payed up all land payments & Taxes & keep the Smith Bros Sheep Co Cr as good as has always bin   you can get up the papers so you ar safe & at the same time gives me a chance to handel my self to advantage f if Miles fails you & Mac can fix things so that I will not have to come ontill Apr or May or may you can send the Papers down hear for I and Mary to signe I will pay all revenewe Stamps requires I don't think you will have to pay taxes on the $85000 while it is repsented by the Smith Bros Sheep Co Stok as I have to pay on all the property if you did have to pay taxes I will agree to pay it for you So it will leave it just the same as gov bonds now I hope you will consider this & after Feb the first proceed to fix up the papers or soaner if you wish I could borrow the money of the Bank at Helena by giving the sae seciorty but I would soaner deel with you & you ar jest as safe as tho you had gov bonds let me hear from you at once & oblige

" 'Your uncel JOHN.'

"On the same day, to-wit, January 16, 1899, the executor wrote from White Sulphur Springs, Montana, to John M. Smith at Pasadena, California, the following letter:

" 'Office of N. B. Smith, County Attorney, Meagher County,

" 'White Sulphur Springs, Mont., Jan. 16, 1899.

" 'John M. Smith, Pasadena, Cal.

" 'Dear Uncle: Your telegram came to hand in which you said you would take the stock. I want a clear understanding with you, so that there may be no hereafter in the matter. It is understood that I am to get $85,000 for the stock and the estate is to have that and not owe the Company anything for money advanced for uncle Bill's estate. Mack wrote me the other day about the four hundred dollars you were to pay, but I will make no claim as to that if you take the property at the above figure You had better pay a portion down and then I will make the return to the court, and if the court approves the sale, of which I have no doubt, I will want the remainder of the money. Plese let me hear from you at once in the matter.

" 'Yours truly,

" 'N. B. Smith.'

"The record shows that on the 20th of January, 1899, the executor wrote to John M. Smith a letter which in some way disappeared, and is not produced. Before it could have been received at Pasadena, Cal., John M. Smith wrote from that place to the executor this letter:

" 'Pasadena, Cal. Jan 22 1899.

" 'N. B. Smith   Dear Nefue  I received yours of the 16 in reply to my telegram,  I had written 2 letters that you have no dout receved befoar this in which I asked turms but have not herd from either yet it dont look as tho Miles is going to make a deel.  I now will ask you the amount you wish me to pay down on the property & what interst you want on the balence I will take the astates Stock at $85000 and no claim on the astate for enny money advanced it at enny time tell me the least you will take as a down payment & what time you will give on the balence & what interst ontill payed & you hold all the property as securty I made you a propersition in my last but don't know how it will soat you pleas give me yours best turms as soan as you get this and I will arange to meet it on the $85000 bases Yours Truly

Your uncle John. I think the coart will aprove of the security & offer for the balence I know your Bondsman would I dont think that it will take me longer then May the first to make some turn So I will get the balance for you.'

"On the 21st of January, 1899, Mr. Ramsey, cashier of the Union Bank & Trust Company, of Helena, Montana, wrote this letter to John M. Smith:

" 'Mr. J. M. Smith, Pasadena, California.

" 'Dear Sir: In response to your favor of the 14th, we have wired you to-day that we would make the loan of $90,000 at 9% interest. We suggest in the telegram, however, that the offer to make would be based upon whether or not you should use the money at once. Unless you could take it right away, we would not, of course, want to carry so large a sum here for any particular length of time, awaiting investment. I really hope you will be able to use it. If you have not telegraphed us at the time this letter reaches you of your conclusion as to whether or not you can use the money, we want to ask you to do so, as the loan is a large one and we might have to loan the funds elsewhere, which we would not do, in anticipation of your possible call for these funds. Yours respectfully, George L. Ramsey, Cashier.'

"That John M. Smith replied by wire to the letter last quoted that he did not want the money is shown by this letter from Ramsey of date January 28th, 1899:

" 'January 28, 1899.

" 'Mr. John M. Smith, Pasadena, Cal.

" 'Dear Sir: We now have your telegram reading: 'Do not want money,' which is interpreted to mean that you are not in a position to use the money just at the present time. But that you may possibly desire to later. If our surmise is correct, I beg to advise you that we will be glad to figure with you whenever you are ready; but we would not of course want to promise so large an amount of money at any time in the future as it is a considerable sum and we may have to invest it elsewhere. Just at this

time we would be very glad to make the loan and it is possible we may be in the same position whenever you get ready.

" 'Your respectfully,

" 'GEORGE L. RAMSEY,

" 'Cashier,'

"January 24, 1899, the executor wrote to John M. Smith at Pasadena, California, as follows:

" 'N. B. Smith, County Attorney, Meagher County,

" 'White Sulphur Springs, Mont., Jan. 24, 1899.

" 'J. M. Smith, Pasadena, California.

" 'Dear Uncle: Your letter of the 16th of Jan. came to hand. I cannot sell the way you indicated. The only way I can sell is for cash down. If you are appointed guardian of the children then I could turn the money over to you. As I told you all the time I have no right to sell on credit. You had better forward me a draft for ten thousand and then I will file the petition, and on the approval of sale by the court the balance can be paid. The offer that I had was a cash down offer. If you but [buy] the stock the company can run on just the same and I can act as one of the trustees as I have some stock in my own name. Give my love to all.

" 'Yours, etc.'

"Before the letter last quoted could have been received, John M. Smith wrote from Pasadena to the executor as follows:

" 'Pasadena, Cal. Jan. 27.

" 'N. B. Smith:

" 'Dear Nefue: I receved yous of the 20 & I think your plan good I will take steps to get the ten thousend down payment & we will proceed to business at once I will write to the Bank & arange for the money if you have me appointed garden for the Children as soon as I sell out I uou & ['Wan to,' according to original exhibit] invest in Gove bonds all thair money and also my one as I dont intend to try to dew enny buisness after I sell out & I fully intend to let goew this spring I think your sugjes-

tion a good one I think I should have the children come out hear the schools is first clas & the climat is good also good society.

" 'Yous Truely

" 'J. M. SMITH.

" 'will wright agane soon.'

"On the same day, to-wit, January 27, 1899, John M. Smith wrote from Pasadena, California, to Ramsey, this letter:

" 'Pasadena, Cal   Jan 27, 99.

" 'G L Ramsey Helena Mont

" 'I received yours of the 23 in regard to the mony I did not want it all at once.  I received a letter today from the adminestrator & now I am in shape to use ten thousand of the money at once.  I wish the lone for 6 months with the understanding that I have the privilege of paying it at enny time I can befour it is dew intrest to be at the same for what time I have used the money.  You understand I want the money to make a payment on the estate of my brother the money will be turned ovr to the adminestrator N B Smith at White Sulphur Springes.  if you will you can make out a Note for ten thousand & send it hear to me I will signe & retern then I will turn it over to the admnestratr & close a deel then I will be the eentier oner of the Smith Bros Sheep Co

" 'Yous respctfuly

" 'J. M. SMITH.'

"Four days thereafter, to-wit, January 31, 1899, John M. Smith wrote to Ramsey as follows:

" 'Pasadena Cal Jan 31 1899

" 'George L Ramsey Helena

" 'Sir: I have taken the liberty of drawing a check on your Bank for ten thousend Dollars $10,000—in favor of N. B. Smith of White Sulphr Springes the adminestratr of my Brothers astate I dont think that the money will be caled for onley plast to his cr.  I inclose his letter so you can se how we intend to manage so that I don't think we will have to call for enny of the money will leave it as a creddet for when I am apointed gardeen of the children I will turn it all back to the Bank and pay what intrest

has acrued for what time we have the money. hoping this will meat your aprovel I wrote you a letter a few days ago asking you to forward me a Note for $10,000—for me to signe but I have not receved it yet hoping you can favor me with my request & oblige.

" 'J. M. SMITH.'

"On the 2d of February, 1899, Ramsey wrote to John M. Smith as follows:

" 'Mr. John M. Smith, Pasadena, California.

" 'Dear Sir: We enclose you herewith a blank note for $10,000, sent agreeable to your favor of the 27th, drawn for six months, with the understanding that you shall have the privilege of taking it up at any time prior to maturity if you like, interest to be charged only for the actual time the money is in use. I also inclose several blank notes, which can be filled up by you at any time the money is needed. With regards, I am,

" 'Yours respectfully,

" 'GEORGE L. RAMSEY,

" 'Cashier.'

"On February 6, 1899, Ramsey wrote to John M. Smith as follows:

" 'Mr. J. M. Smith, Pasadena, California.

" 'Dear Sir: We now receive your letter of January 1st [31st] and beg to advise that we shall have pleasure in honoring your check for $10,000, when it shall be presented. We return herewith letter from N. B. Smith. With regards, I am

" 'Yours respectfully,

" 'GEORGE L. RAMSEY,

" 'Cashier.'

"On February 6th Ramsey also wrote to N. B. Smith this letter:

" 'Union Bank & Trust Company of Montana.

" 'Helena, Feb. 6, 1899.

' 'Mr N. B. Smith, White Sulphur Springs.

" 'Dear Sir: Receiving a letter to-day from Mr. J. M. Smith, advising that he had drawn on us for $10,000 in your favor, and

this letter indicating that he would probably draw further checks, I am lead to suggest that we would be very happy indeed to serve you as a depository, for all or a part of the proceeds of the check, if it is in your plans to leave it on deposit.

" 'Yours respectfully,

" 'GEORGE L. RAMSEY,

" 'Cashier.'

"On the 8th of February, 1899, John M. Smith wrote to Ramsey as follows:

" 'Pasadena Cal Feb 8 1899.

" 'G L Ramsey   yours of the 2 came to hand last night I hear sign & return Note.   When I am caled on for the balence I will fill out & send on Notes to cover the balence of the perches.   I dont think that one dollar of it will be caled for except as a credet as you saw in my last letter the way N B Smith perposes to dew with me   Many thanks for your acomedation

" 'Yours Truely

" 'JOHN M. SMITH.'

"On the same day, to-wit, February 8, 1899, the executor wrote from White Sulphur Springs, Montana, to the Union Bank & Trust Company, as follows:

" 'White Sulphur Springs, Mont., Feb. 8th, 1899.

" 'Union Bank & Trust Co., Helena, Mont.

" 'Gentlemen: I don't know yet what disposition I will make of the money that J. M. Smith will place to my credit.   I would want a certificate of deposit payable on demand.   If my Mr. Smith is appointed guardian this money will be turned back to him.   I will make no arrangements about the money at this time as I want to get the estate settled up as soon as possible.

" 'Yours truly,

" 'N. B. SMITH.'

"On February 10, 1899, a certificate of deposit for $10,000 was issued by the Union Bank & Trust Company, and sent to the executor, with a letter of that date in which the bank said: 'We are this morning placed in possession of your favor of the 8th instant and having instructions from the First National Bank

of White Sulphur Springs to send you certificate of deposit for J. M. Smith's check of $10,000, we are now having pleasure in handing you same herewith. We note that you do not care to make any arrangements about the money at this time, as it is your desire to get the estate settled as soon as possible.'

"On February 12, 1899, the executor wrote to the Union Bank & Trust Company this letter:

" 'White Sulphur Springs, Mont., Feb. 12, 1899.
" 'Union Bank & Trust Co., Helena, Montana.

" 'Gentlemen: Your favor of the 10th enclosing draft for $100000 [$10,000] came to hand. I am much obliged to you for your kindness in the matter. I presume I will leave the money with you for the present, as I have no use for it. If my uncle is appointed guardian of the children, then in that case, the money will all be turned back to him as guardian. I think I can wind up the estate within three months. I shall be pleased to meet you when I come to Helena which may be some time in this month.

" 'Very respectfully,
" 'N. B. SMITH.'

"The executor proceeded to make application for the confirmation of the sale of the stock, and engaged, in behalf of John M. Smith, an attorney named Waterman to make application for the appointment of John M. Smith as guardian of the children, the return of sale being filed with the court by the executor on the 20th of February, 1899, and three days thereafter, to-wit, February 23, John M. Smith's application for his appointment as guardian of the children was filed by Max Waterman as his attorney. On that same day, to-wit, February 23, 1899, the executor wrote to Mrs. Reynolds this letter:

" 'Office of N. B. Smith, County Attorney, Meagher County,
" 'White Sulphur Springs, Mont., Feb. 23, 1899.

" 'Dear Aunt: Uncle John intends to apply to be the permanent guardian of the children. I presume you will be notified in the matter. Under our law a child that is fourteen years of age can appoint his own guardian. I think Willie is about that

age. If he is that old he can appoint who he wants and the court will confirm the appointment. Under our law a guardian has to be appointed so that the estate can be distributed. The estate will have to go into the hands of a guardian so that it can be invested in bonds. Uncle John's address is 481 Eldorado Street, Pasadena, California. He will have to give a bond to the amount of about ninety thousand dollars. I don't think he will make any change in the case of the children, and he can't make any change after the children become 14 years of age for then they can appoint their own guardian. I thought it my duty to mention the fact to you so that you might understand the proceedings and why they were taken. You see I will have the eighty-five thousand dollars, and the same must be invested which I could not well do as executor. It was uncle Will's desire that you should look after the children and that desire will no doubt be carried out. I have explained fully because I thought you might worry in the matter. If you have any suggestion to offer would like to hear from you in the matter. Give my love to the children.

" 'Yours etc.

" 'N. B. SMITH.'

"On the 1st day of March, 1899, John M. Smith wrote from Pasadena, California, to Mr. Ramsey at Helena, Montana, as follows:

" 'Pasadena, Cal., March 1, 1899.

" 'George L Remsey Helena Mont. If enny one deposets $5000—to my cr for a option Wire me at once at my expen 481 El Dorado St Pasadena Cal. I cant say jest when I will be cald to turn over the other $75000—on the Ranch Deele. the Money will not be drawed out of the Bank but left as a cr to the adminestrater N B Smith as soon as I am appointed gerdean the money will be turne back to me I pay intrest for what time I have it. Will I have to send my note or can you pay my check by Cr to N B Smith for the amout & he leave it in the bank & transfer it back to me.

" 'Yous Tuely

" 'J. M. SMITH.'

"March 10, 1899, the Union Bank & Trust Company wrote to N. B. Smith this letter:

" 'Union Bank & Trust Company.

" 'Helena, March 10, 1899.

" 'Mr. N. B. Smith, White Sulphur Springs.

" 'Dear Sir: As you are perhaps aware, we had made arrangements with Mr. John M. Smith to advance him the sum necessary to purchase the the estate's half interest in the Company. He writes us by letter received to-day, as follows: 'I can't say just when I will be called to turn over the other $75,000 on the ranch deal.' The amount to be advanced on this transaction is a large one, and we like to figure ahead a little bit, so that we may calculate at all times upon the amounts which we have arranged to advance to our several customers, and I am going to take the liberty of inquiring whether you can tell us at this time about when the balance will be called for, so that we can figure accordingly. We felt quite a bit complimented at your making us your depository for the payment that has already been made by Mr. Smith, and I assure you we will be happy to serve you in the future as well.

" 'Yours respectfully,

" 'GEORGE L. RAMSEY,

" 'Cashier.'

"On the 28th of March, 1899, the sale of the stock to John M. Smith was confirmed, and the order of confirmation signed and filed. On the same day, to-wit, March 28, 1899, John M. Smith, who was then in California, was appointed guardian of the persons and estates of the minors, the order made and filed reciting due notice of the application, and directing 'that letters of guardianship of the persons and estates of said minors be issued to him upon his giving a bond to each of said minors in the penal sum of thirty thousand dollars, and upon his taking and subscribing the oath according to law.'

"On the 18th of April, 1899, John M. Smith wrote from Pasadena, California, to Mr. Ramsey at Helena, Montana, as follows:

" 'Pasadena, Cal Apr 1899

" 'Mr. G. L. Ramsey Helena Mont

" 'I will be in Helena about the 18 of May. I leave hear the 13 then I will be redey to straten out business sadsfactry I hopw I will have MvNaught send the Stock over to the Bank so it will be thair when I get back I will have N B Smith meet me in Helena & then we can fix up every thing sadesfactory I drew a check to N B Smith for $75,000—but I dont think he will Send it in ontill I get back.

" 'Yous Truely

" 'J. M. SMITH.'

"April 24, 1899, the bank replied to John M. Smith by letter, saying: 'We are ready to honor your check for $75,000 when Mr. N. B. presents the same.'

"On the 27th of April, 1899, a four months note for $75,000 of John M. Smith, bearing 9 per cent interest, was cashed by the Union Bank & Trust Company, and the proceeds put to his credit, with which the bank paid the $75,000 check which John M. Smith had given upon it to the executor, and which was by the executor indorsed, such payment being then charged by the Bank & Trust Company to John M. Smith's account. The before mentioned $10,000 certificate of deposit was at the same time surrendered by the executor, who took from the Bank & Trust Company a certificate of deposit to his order for $80,000 and deposited $5,000 of the amounts mentioned to his personal credit; $2,161.49 of which he paid himself as due him 'on the sale of the property,' and the balance to other persons and for other purposes.

"On the 28th of April, 1899, John M. Smith wrote from Long Beach, California, to the executor, this letter:

" 'Long Beach, Cal., Apr. 28, 1899.

" 'N. B. Smith:

" 'Dear Nefue I return Pour of atorney [appointing N. B. Smith John M. Smith's attorney in fact] with instictions to indors the stock that I bought of you to the union Bank as colatral security for the payment of the $10,000 & $75,000 nots

now in the bank. I am booked to leave hear the 13 of May for Helena will arrive about the 17 or 18 & want you to meat me in Helena at that time if I should deside to make it later I will wire you to that afect.   *   *   *

"'Yors Truly our love to orseal

"'J  M  S.'

"John M. Smith returned to Montana from California on the 18th of May, 1899, and on the 25th of the same month executed his bond as guardian and took the oath of office and filed them with the court.   June 1, 1899, the executor filed the final account of his administration of the estate of William A. Smith, and on the 12th of June of the same year a decree settling the account and distributing the estate was signed and on the 14th of June, 1899, placed upon file, the decree providing, among other things: 'That the said executor shall be finally discharged from his duties as such executor upon his filing a receipt for the residue of said personal property duly signed by John M. Smith as guardian of William Smith, Nellie Mae Smith, and Annie Maud Smith, minor children of said deceased, and upon the filing of such receipt his bondsmen as such executor shall be discharged.'

"On the same day, to-wit, June 14, 1899, the executor paid the entire amount in his hands over to the guardian, John M. Smith, and took his receipt therefor as such guardian, whereupon an order of final discharge of the executor was signed and filed.   John M. Smith thereupon went to Helena, Montana, and on the 17th of June, 1899, there used the money of his wards so received by him in discharging his indebtedness to that bank, as far as it would go, giving a new note to the bank for the balance due it from him.   John M. Smith was questioned in respect to that matter when upon the stand as a witness in this cause, and gave this testimony:

"'Q.   Mr. Smith, I believe you said this morning, that you had used the money turned over to you by Mr. N. B. Smith when you were appointed guardian, to pay your notes at the bank? A.   I did.

" 'Q. Was the money cash that he turned over to you, or was it certificates of deposit? A. It was a certificate of deposit; it wasn't counted out as cash, but it was a credit certificate of deposit that he turned over to me when I qualified as guardian, he turned it over to me as administrator. I done business with the bank here, and I will refer to them. I cannot remember just about how it was done at the time, but I will refer you to the bank and Geo. L. Ramsey; they are better authority than my memory is, a great deal.

" 'Q. I will state, Mr. Smith, for your information, that these two certificates of deposit were produced here by the bank officers. A. The certificates of deposit were turned over to me as guardian of the children of William Smith by the administrator.

" 'Q. And you turned them into the bank in payment of your note? A.. I thought I had a right to.

" 'Q. But you did? A. I did, I thought I had a right to, because I gave security for the amount.

" 'Q. Did you understand when you did that that you were using money of minors for your own purposes? A. I understood I was using it, and that I had a right to; I didn't talk with anyone about it.

" 'Q. You thought that you had a right to take the money of minors and use it to pay your debts? A. As I had given security for that money, it was the same as though it was in my possession.

" ' Q. Do you understand that you, as a guardian, had the right to use guardianship money, the money of minors, to pay your own debts and for your own personal account? A. I may have made a mistake, but I didn't do it with the intention of defrauding anybody; I might have made a mistake.

" 'Q. But you knew what you were doing? A. I knew I was paying off my indebtedness.

" 'Q. And using the money of minors? 'A. The money that was given security for.

" 'Q. Without asking anybody's permission? A. Without asking anybody's permission.

" 'Q. Without consulting anybody? A. I didn't do it with the intention of defrauding anybody, and if I have wronged anybody in any way I am willing to make it right.

" 'Q. Was it your view at that time that you as guardian had a right to do such a thing? A. I thought this way: that it was just the same as if I put it in government bonds if I paid the same interest. I acknowledge it may have been wrong, but I didn't do it with the intention of defrauding anybody. I paid off my note, and that is the condition of things just as they were.'

"N. B. Smith, the executor, testified that he did not know until the fall of 1899 what use the guardian had made of his wards' money; that 'in October, or before October,' 1899, the guardian told him. He also testified in answer to the question, 'Did you report the fact to the judge of the court that the money you had given to John M. Smith, turned over to him as guardian, had been used by him to pay off his own debts?' 'I made no such report whatever.'

"On the 20th of November, 1899, N. B. Smith wrote to Mrs. Reynolds this letter:

" 'Office of N. B. Smith, County Attorney, Meagher county.

" 'White Sulphur Springs, Mont. Nov. 20, 1899.

" 'Mrs. D. B. Reynolds, Fayette, Ohio.

" 'My Dear Aunt: Enclosed find draft for four charges for looking after and caring for the minor children of uncle Bill, until December 1, 1899. Please sign the enclosed receipt. In regard to uncle John buying the stock will say that he borrowed the money from a bank in Helena to buy the stock. I would not let him have the stock until he had actually paid me the money. I had the money in my name in the bank until I was finally discharged from my trust. When I made my final account I showed the judge my draft, and my bank account subject to check. I turned over to him the money and took his receipt for the same, and filed the same in court and the same is now a matter of record. The Union Bank & Trust Company furnished

his bond and same is perfectly good. He has to pay the bank quite a sum of money for furnishing the same. I think he has to pay about three hundred dollars a year for his bond. The judge and uncle John and I talked over the matter of the use of the money, and the understanding was that he should pay four per cent for the use of the money until such time as it should be invested in bonds. That is better than we could do with government bonds, and as long as the Union Bank & Trust Company is his surety the same is perfectly safe. Nothing has been said as to the compensation that the court will allow him. I think the compensation would be arrived at in this way, he would be allowed his actual expenses in looking after the children, and a reasonable amount for what time spent in looking after the children and their estate, and the costs connected with the court procedure. In cases of administrators the law fixes the compensation at a certain per cent. based on the value of the estate. I don't think the court would fix his compensation at anything unreasonable. Uncle Bill reposed confidence in me and I think I did the best thing for his children that could have been done in making the sale. Before making the sale I talked with the best business men of the county in relation to the matter, and not one but what told me to close the sale as I had made a great deal. Although I am no longer administrator, yet I shall always look after their interests.     *   *   *

" 'Your nephew.'

"Both John M. Smith and N. B. Smith gave some testimony tending to show that in 1899 the former had some talk with the judge of the court in which the guardianship matter was pending, about his (John M. Smith's) using the money of the minors and paying interest on it at the rate of four per cent per annum.

"In December, 1900, this order was made and entered in the matter of the estate and guardianship of the minors:

" 'Probate Minutes, December, 1900.

" 'Tuesday, the Eleventh day of December, 1900.

" '255.

" 'Estate and Guardianship of Wm. Smith et al., Minors.

" 'Max Waterman, counsel for guardianship, asked to have his name withdrawn as counsel in the case. N. B. Smith asked to have his name entered as counsel instead of the Max Waterman's. John M. Smith, the guardian of said minors, having made application to the court for an order authorizing him to borrow the funds in his hands belonging to said minors amounting to the sum of about $82,000 at the rate of three per cent per annum. The court being fully advised in the premises: It is ordered that said guardian be authorized to borrow said sum of $82,000 at the rate of 3% per annum, and to so hold the same at said interest until the further order of this court.'

"N. B. testified that he did not procure this order to be made, and did not know of it at the time. He admits in his testimony that he thereafter acted as the attorney for the guardian, and prepared the final account of the latter in which the wards were charged for the money paid by the guardian to the surety company for going on his bond as guardian, and in which also the guardian was charged interest on the money of the wards only from December 11, 1900, and at the rate of three per cent per annum, but claims that, as respects the interest, his doing so was an inadvertent mistake.

"In regard to his guardianship attorney John M. Smith was questioned and answered as follows:

" 'Q. Who was your lawyer in the guardianship matters? A. Waterman for about a year and a half or two years. I forget about it, but Waterman acted as my attorney.

" 'Q. Max Waterman, of White Sulphur Springs? A. Yes, he used to assist me about court matters and get the accounts in and accepted. I didn't know anything about the business myself. Badger made out some first of it, and Waterman acted later on, and after that I had N. B. Smith. He was fairly con-

versant with everything, and I knew he would do the square
business by all the parties concerned and so I got him after
that—after Waterman.'

"And there is in the record this letter from John M. Smith to
Mr. Ramsey, of date October 15, 1900;

　　　　　" 'Martindale, Mont. Oct 15 1890 [1900]

" 'Geo L Ramsey Helena I have sent to the Springs to have
N. B. Smith fill out my report as Gardien of Brother William
he is my attorney & Keeps My acounts it will be in in a few
days as filed in caar.

　　　　　　　" 'Your treuly

　　　　　　　　　" 'J. M. SMITH.'

"The appellant was but ten years old when the stock was sold,
and became eighteen on the 27th of August, 1906.    On the 5th
of November of the same year her guardian paid her the
amount shown to be due her by his final account, which had been
approved by the probate court.

"In the deposition of the complainant which was introduced
on the trial of the cause, she was asked, among other things, what
information she had regarding the sale of the stock, when her
guardian settled with her in November, 1906, to which interroga-
tory she answered: 'I knew that the sale had been made, of
course, and I knew that uncle John had been the purchaser—
that is all I knew.   I knew nothing about the stock company or
the incorporation of the company.   I received my money, and
that was all I knew about it—what he gave me.'   Being asked
what knowledge she had at that time regarding the method,
validity and good faith of the sale of the stock, she answered:
'I had no knowledge of its method, its validity, or of its good
faith, and knew nothing about their intentions.'   In response to
the interrogatory, 'What was told you by your uncle, John M.
Smith, or your cousin, Napoleon B. Smith, the above-named de-
fendants, about your affairs, and particularly about the sale of
said stock?' she answered: 'Nothing was told me by either John
M. Smith, or Napoleon B. Smith, concerning the estate in any
way—unless I asked it directly, and I never talked to "Poly"

about my affairs very much, but I have spoken to Uncle John—
he always avoided me or would talk in an indirect way, and I
knew no more when I finished than when I begun. He didn't
seem to care about discussing it very much—he didn't want me
to think much about it. I once asked him about the difference
between his estate and ours and why he had more than we had,
and he said, "Papa owed large sums of money when he died, and
they had to be paid off." I also spoke about the three per cent
which was paid us on our money, and asked him why he didn't
give us more—he said, "It was all he could afford." "Poly"
never told me anything at all, except what we had, and in fact
intimating that we ought to be thankful for what we got.'

"Both John M. Smith and N. B. Smith were questioned in
respect to conversations they had with the complainant. John
M. Smith gave this testimony:

" 'Q. Do you remember when the complainant in this suit
came out to the ranch at the time of the settlement? A. I
don't remember the date, but it was in August, I think.

" 'Q. Of what year? A. The 27th of August.

" 'Q. Of what year, I said? A. 1906.

" 'Q. About how long was she there? A. Well, she wasn't
there long. I can't remember, but it wasn't but a few days.

" 'Q. What occurred in her matters while she was there?
A. N. B. Smith, I think was down there, and was talking about
her loaning money. There was a party wanted to borrow the
money.

" 'Q. Was there any settlement made with her? A. The
settlement wasn't made at the ranch.

" 'Q. Where was it made? A. At White Sulphur Springs.

" 'Q. Was it made that year? A. Yes, sir. I wasn't pres-
ent at the settlement. N. B. Smith done the entire business, he
and the court, as I recollect it.

" 'Q. Do you recall any talk when N. B. Smith was down
at the ranch and the complainant was down at the ranch, about
her affairs? A. I cannot recall just what it was, no. They
had some talk, but I cannot—

" 'Q.  Where did they have it?  A.  In the office.

" 'Q.  Who was present?  A.  I don't know as I could say exactly who was present.

" 'Q.  Was the complainant present?  A.  The complainant was present.

" 'Q.  Was N. B. Smith present?  A.  N. B. Smith and myself.

" 'Q.  Were you present?  A. Yes, sir, and I think Mr. Flatt and I think probably my wife was.  I don't know whether she was or not.  I know at the time she was there it was talked over, but I can't recall the conversation.

" 'Q.  What was talked over—what was it about generally?  A.  It was talked about what was best for her to do with the money, as near as I can remember.

" 'Q.  Was there any talk about the matter of your purchase of the stock of the company?  A.  I don't remember that that was talked over, but it might have been; I don't remember.

" 'Q.  Was there any explanation given her of her matters and how the results and amounts due her were arrived at?  A.  I think that N. B. Smith gave her full information in regard to it.  I think so, as near as I remember, but I cannot recall what it was.'

"N. B. Smith was also questioned in respect to the same matter, and also in respect to a visit of the complainant to Montana in 1904, when she was about sixteen years old, as follows:

" 'Q.  Do you recall when the plaintiff came out to Helena in 1904?  A.  Yes, sir; I recall when she came out here.

" 'Q.  Where did she stop, if she stayed at all in White Sulphur Springs?  A.  Well, she stopped with us a few days.

" 'Q.  At your home?  A.  Yes, sir, at our home.

" 'Q.  With yourself and wife?  A.  With myself and wife.

" 'Q.  And during that time, was any explanation given to her of these matters about which you have been testifying?  A.  Yes, sir.

" 'Q.  What was done in that regard, you may tell.  A.  I showed her the final account of myself as trustee or executor, as

in my letter, I invited her to come out here, that was in 1903. I also showed her the annual account. I said I would be glad to explain the affairs of the estate to her, that I was fixing up the annual account as guardian and she was there at the time, and when I was at the courthouse I got the final account and the annual account as executor and showed them to her.

" 'Q. Where were you when you showed them to her? A. I was there in my office at the little room at the north—there is two rooms to the office.

" 'You said as you had invited her in your letter? A. Yes, sir, in my letter I had invited her.

" 'Q. What letter did you refer to, the one of August 13, 1903, that is in evidence here? A. August 13, 1903.

" 'Q. In connection with the explanation of the papers in question, did you say anything to her about it, or what did you say? A. Oh, I explained to her about the sale of the property.

" 'Q. As you have—

" 'Witness (continuing) : I explained to her about the sale of the property and the items of the account.

" 'Q. Did you tell her the facts about these matters as you have told them here? A. I related the facts to her about the sale and why I sold the property.

" 'Q. Well, did you give her information the same as you now tell the matter, or definitely? A. Well, the same information—probably I didn't go into it quite as fully, but I explained generally the nature of the transaction and why I sold it, and what I got for it, and showed her the accounts.

" 'Q. Do you remember, in 1906, when the complainant came out to Montana? A. Yes, sir.

" 'Q. Did you see her at that time? A. Yes, sir.

" 'Q. Where?' A. I saw her down at the ranch of Smith Bros. Sheep Company.

" 'Q. What was she doing down there? A. She had, I think, come back from Germany if I remember correctly, and was going back.

" 'Q. Well, that states where she came from and where she was going to, but I asked you if you knew what she was doing

down there on the ranch? What she was there for. 'A'. Well, she was there, looking after her estate. I don't remember whether the final account had been put in or not, but we discussed the matter there in our presence there in the office.

"'Q. In the office, where do you mean? A. The office of Smith Bros. Sheep Company.

"'Q. Who discussed it? A. Well, I discussed it with her and Uncle John.

"'Q. Who was present? A. Mr. Flatt' was present.

"'Q. And you discussed what matter? A. Oh, about the sale of the property, and how it had been handled, and how we had tried to manage the property for her.'

"In the same connection a letter written by N. B. Smith to the complainant's younger sister on the 7th of April, 1905, is pertinent:

"'N. B. Smith, County Attorney, Meagher County.

"'White Sulphur Springs, Montana, April 7th, 1905.

"'Dear Anna: Your favor of the 4th inst. came to hand. Will say presume you have my letter inclosing the $500. Yes, you will get your money in June. You need be at no expense about attorney's fees. I would like to have you come out and be here when the estate is settled. You can go over all the accounts with me and see where the money has gone. I have taken receipts for everything and have paid out all money by checks. I want you to know everything and then I will feel that I have done my duty.  *  *  *

"'Your cousin,
"'N. B. SMITH.'"

John M. Smith, as guardian, settled his final account with the plaintiff on the same basis employed in settlement with Nellie Mae Moore, to-wit, three per cent interest on the principal sum held by him from December 11, 1900. The net amount received by the plaintiff was $23,954.01. The initial amount accounted for was one-third of $82,170.20, or $27,390.06. The complaint charges that the sale was "illegal, fraudulent and collusive," and that "Napoleon B. Smith and John M. Smith colluded and

confederated to secure the said property to the said John M. Smith, and to sell the same to him at much less than its real value." The claim that the property was sold at less than its then present value was virtually abandoned by the appellant in this court, and, indeed, such a contention cannot be justified in the evidence. The United States circuit court of appeals decided that "the sale of the stock of the estate of the deceased Wm. A. Smith and the subsequent misappropriation of the money of the minors by their guardian were parts and parcels of a scheme entered into by and between N. B. and John M. Smith, which was a fraud upon the minors and the probate [district] court." Judge Hunt, who tried the Moore case in the federal district court, and Judge Stewart who heard this case in the Meagher county district court, were of the opposite opinion; that is to say, in their judgment there was no fraud, collusion or conspiracy and the sale was in all respects legal, regular and free from fraud.

The additional testimony given by plaintiff in the state court was, in part, as follows: "I became twenty-one in 1906; had attended school in Missoula, at Shattuck Military School and at Notre Dame; had had no business experience; the settlement between myself and my uncle was transacted by myself, N. B. Smith and Mr. Flatt; Mr. Flatt gave me a check at the ranch for a part of the money and I think N. B. Smith gave me part of it; I saw the expense account and what the money was supposed to have been spent for; I did not question it further than this, that I asked what certain accounts were for and any account that I happened to pick out and see I would ask what it was. Q. Now, Mr. Smith, what, if anything, did you know at that time in relation to the circumstances and conditions under which your uncle, John M. Smith, became the apparent owner of the stock that had formerly been owned by your father in the Smith Bros. Sheep Company? A. Nothing at all, but one thing I asked my uncle John while on the ranch—I asked him why it was that our property was sold and he said that he did not feel that he wanted us children to take a chance so he bought the property. I knew nothing of the fact that the money

that was turned over to him he used to pay off his notes at the bank; knew nothing of his purpose to have himself appointed guardian so that he might utilize the money to pay off the notes. I knew nothing of the affidavit presented to the court that the purpose was to sell the stock of John M. Smith in conjunction with the stock of the estate in order that the best price might be realized for it, or that John M. Smith had gotten $13,000 in two years after father's death while the executor of father's estate only procured about $800. Mr. N. B. Smith told Mrs. Reynolds and she told me that father's stock had been sold to my uncle." The inventory value of the stock in the Smith Bros. Sheep Company belonging to the estate of Wm. A. Smith, deceased, was $61,475.

We approach the final determination of the case with the greatest respect for the decision of the learned judges of the circuit court of appeals. Nevertheless it is our duty to decide it in conformity with the dictates of our own consciences. In so doing we first consider the situations and characters of the persons accused of having formed a conspiracy to defraud the plaintiff; for unless such conspiracy existed, the conduct of the parties subsequent to the sale becomes altogether immaterial. The principal actor in the alleged plot is John M. Smith, a man sixty-four years of age, of comparative wealth, in poor health, who, whatever motive may have actuated his later conduct, appears beyond a doubt to have been sincerely desirous of disposing of his interests in the sheep business and retiring from active participation in industrial pursuits, at the beginning of the negotiations for the sale of the corporate assets. This man, who is now accused of so unnatural a purpose to overreach and defraud his brother's orphan children, had been intimately associated with that brother for many years prior to his death. They lived in a sparsely settled community; John at least was illiterate; but by their personal efforts and attention to business, they had succeeded in accumulating a considerable fortune. John, on account of the exposure incident to the conduct and management of a large sheep ranch, had contracted a disease which necessitated his spending the winters in California. He died

pending this litigation. It is not unnatural to assume from a contemplation of his life and its environments that he was provincial in his habits and ideas; that the spirit of thrift and a desire to save characterized his conduct and dictated his actions generally. This is constantly to be borne in mind in passing judgment upon the facts in the case and the successive steps taken looking to a disposition of the property of the parties. It is not unreasonable to assume, from their relationship and association, that some considerable degree of affection existed between the brothers. John was present at the death of William, and the latter's last words were a request that John would look after the interests of his children. The promise was given and John testified that it had been faithfully kept. It is impossible to read the correspondence of this uneducated man with his nephew N. B. Smith, and thereafter entertain a doubt that, in the beginning, at least, he entertained a sincere regard for the plaintiff and his sisters, was actuated by the highest motives of solicitude for their welfare and a desire to protect and conserve their inheritance. Although he held a controlling interest in the stock of the corporation, he was reluctant to sell his portion alone, for fear the minority interests of the children would suffer if strangers acquired his stock, and in giving an option to McNaught he stipulated that it should be subject to the approval of the executor of his brother's estate. It must not be forgotten, either, that the corporation was a sort of family affair; and the record tends to show that no particular surprise was caused by the fact that John M. Smith was in the habit of drawing from its funds such moneys as he had occasion to require. The books of the concern were kept in a very informal and careless manner. In all probability the brothers had that trust and confidence in each other which was engendered and justified among those whose sturdy characters and integrity of purpose alone made it possible for the early settlers to go into the remote regions of the state and by hard labor and mutual dependence, build homes for themselves and develop the natural resources of the country.

The other alleged conspirator is Napoleon B. Smith, now and for many years a member of the bar of this court in good stand-

ing; a man of family, whose character for truth, honesty and integrity generally, is unimpeached, so far as the record discloses.

The property in controversy consisted of stock in the Smith Bros. Sheep Company, of the appraised value of $61,475, which Judge Armstrong, presiding in the district court of Meagher county at the time, authorized the executor to sell for $75,000 at private sale and which actually sold for $85,000. Several *bona fide* efforts had been made to effect a sale of the whole plant, without success. Touching the value of the stock held by the executor, he testified that he figured $75,000 was what it was worth; that he had counseled with Mr. Anderson, Dr. Parberry, Perry Moore and Len Lewis, representative sheep men of the county, and they advised him to sell if he could get a fair price, which, in their judgment, would be $150,000 to $160,000 for the whole property.

Regarding the methods pursued in the probate proceedings growing out of the administration and guardianship matters shown by the records, it is well to note that White Sulphur Springs, the county seat of Meagher county, was at that time a village of about 450 inhabitants, situated many miles from a railroad; court was held four times a year and it is well known to the profession that probate matters were sometimes loosely conducted in those remote country districts, and the people generally regarded the district judge as a repository for all their troubles growing out of the administration of estates, and did not hesitate to seek his counsel and advice wherever they could encounter him and in the most informal manner.

Coming now to the correspondence which is claimed to disclose the conspiracy: As was well said by Judge Ross who prepared the opinion of the circuit court of appeals: "A sale by John M. Smith of his majority of the stock to a stranger might have worked to the injury of the minority interest of the children of the deceased William A. Smith, so that both John M. Smith and the executor became desirous that both interests should be sold together." The executor, therefore, indorsed upon the option to McNaught an agreement to immediately make

application to the district court to sell the interest of the estate
in the property at the rate therein named, in case a buyer could
be found.  At that time, however, as is also noted in the opinion
of the court of appeals, the evidence shows that the executor
regarded the estimate of John M. Smith as to the value of the
property as too high, as did others.  Under date of December
14, 1897, John M. Smith informed the executor, by letter (we
shall not attempt to reproduce his spelling), that he wanted to
sell out "so as to go some place that I can be with my family
and can send Stanley [his son] to school  as long as I hold it
I can't be satisfied away from it and I don't want to sell out
and leave the children's interest in it  I think the coming year
will be the time to let go of the entire plant  you can at the next
term get a permit to sell Wills interest at any time that we can
get a fair value for it."  He also declared that if he were young
he would not care to sell.  The executor thereupon, on January
24, 1898, obtained from the district court an order to sell the
property for $75,000, which was $13,525 more than its appraised
valuation.  There is no indication in this transaction that the
executor had any notion of selling the property for less than it
was worth, or, indeed, that he intended to sell it to John M.
Smith.  On March 19, 1898, John M. Smith asked the executor
to name the least price he would accept for the children's stock,
saying he understood the latter had authority to sell for $75,000
but that he thought they could do better than that and get them
$80,000 or $85,000 clear.  Bearing in mind that John M. Smith
held his stock at a higher valuation than did the executor that
of the children, it is not unreasonable to conclude that he acted
in good faith in naming a minimum price so that the former
might have a "margin to work on."  On March 25, 1898, the
executor expressed a reluctance to "see a sale go by" and indi-
cated a willingness to take $85,000 for the interest of the estate.
He said: "I want to do what is fair by the estate and also by
you.  I want to see a sale go through in some shape, but at the
same time I want to do the best I can for the estate."  It does
not seem possible that these men would take the trouble to ex-
press such sentiments in private correspondence if they were

engaged in a conspiracy to defraud their minor relatives. On July 2, 1898, John M. Smith very frankly told the executor that their judgments differed as to the value of the property, and that he would not be satisfied with the same amount received by the estate. He then attempted to induce the executor to take less than $85,000. In our opinion these negotiations disclose no concert of action or meeting of minds between these two men. On December 30, 1898, Henry Neill made a cash offer of $80,000 for the stock of the estate. On the next day the executor informed his uncle, by letter, of this offer. In the course of the letter he said: "I am very anxious to do something with the property as I feel that the estate is going to lose money by holding it. If you will make me a cash offer of $85,000 you can have the property. I told Neill I would not make such an offer. McNaught writes me that you owe the company $13,839.35. If you do not take the stock it would be your duty to put your note into the company for the amount. Under our law the only way money can be drawn out of a company by a stockholder is by declaring so much dividend on each share of stock. I do not make the suggestion to hurt your feelings, but you know yourself that such large transaction should not be carried on in such a loose way." It is suggested by the appellant that the expression, "I told Neill I would not make such an offer," discloses some secret understanding between the nephew and uncle at this time. We do not know exactly what was intended by N. B. Smith, but it is fair to presume that if he got his price,—what he thought the property of the estate was actually worth,—he would naturally prefer a relative to a stranger as a purchaser, provided the former wanted to buy. Or it may be said that the only meaning of the words was that the executor told Neill he would not give him an option on the estate's holdings. If Neill had offered more than $85,000 it might be contended that the executor was willing to sell to his uncle at a lesser price, but there is not any testimony to justify such a conclusion. It will be observed, also, that in the letter the executor respectfully, but firmly, called upon his uncle to pay his indebtedness to the company, which is altogether at variance with the idea that they

were conspiring to defraud the children. Note, also, that at this time John M. Smith was endeavoring to obtain an option so that he might dispose of the whole property to some third person, and also that the price of $85,000 had been fixed many months prior to the offer of Neill.

What relation did John M. Smith and Napoleon B. Smith bear to the Union Bank & Trust Company and Mr. Ramsey, its president, at this time? Substantially none, so far as the record shows, save that John M. Smith was very friendly with Henry Klein, the vice-president of the bank. The first account opened with the bank was on April 11, 1898, by the Smith Bros. Sheep Company depositing $2,000. John M. Smith's account was opened April 27, 1899, by a deposit of $75,000. Yet on January 14, 1899, we find John M. Smith openly and frankly informing Mr. Ramsey in a letter, that he was about to buy the estate's interest in the stock of the sheep company and asking if the bank would loan $90,000 on the entire stock. This letter also indicates that at that time he had a mind to sell the entire property at the first opportunity and thought he could make a sale in four or five months. On January 16, 1898, John M. Smith wrote to the executor saying that he had wired an acceptance of his offer to take $85,000 for the stock belonging to the estate, stating also, "If Miles makes a raise I will pay you the $90,000 that you ask you of course would put it in government bonds if you had it now to make things safe and you be absolutely safe I will give you all of the sheep company stock to hold as security and I will pay the same interest that you would get on government bonds and pay you 3 times per year until I can sell out to advantage then you will be safe and if any one is loser it will be me and I am willing to take the chances there never will be a time but what the whole business will be the best of security for that amount but I don't intend to hold it very long at any time that I can make a good sale I will pay off your $85,000. I think this the best way for us to close up business you can get up the papers so you are safe and at the same time give me a chance to handle myself to advantage if Miles fails if you did have to pay taxes I will agree to pay it for you so it

will leave it just the same as government bonds   I could borrow the money of the bank at Helena by giving the same security but I would sooner deal with you and you are just as safe as though you had government bonds.'' To this letter N. B. Smith replied on January 16: ''I want a clear understanding with you so that there may be no hereafter in the matter. It is understood that I am to get $85,000 for the stock and the estate is to have that and not owe the company anything. You had better pay a portion down.'' On January 22 John M. Smith inquired, by letter, how much the executor wanted him to pay down and what interest he would want on the balance. He also said that in his judgment it would not take longer than May the first to make ''some turn so I will get the balance for you.'' On January 21 John M. Smith was informed by Mr. Ramsey that he could borrow $90,000 at 9% interest. On January 24 the executor wrote to his uncle in part as follows: ''I cannot sell the way you indicated. The only way I can sell is for cash down. If you are appointed guardian of the children then I could turn the money over to you. As I told you all the time I have no right to sell on credit.'' But on January 20 the executor wrote the so-called ''lost letter,'' which is thought by the appellant to have mapped out a fraudulent scheme to defraud him and his sisters. It really makes very little difference who first proposed the plan. There does not appear to have been anything secret about it. John M. Smith sent the ''lost'' letter to Ramsey, who read and returned it. On January 27th John M. Smith wrote to the executor: ''I think your plan good. I will take steps to get the ten thousand down payment and we will proceed to business at once. I will write to the bank and arrange for the money if you have me appointed guardian for the children as soon as I sell out I want to invest in government bonds all their money and also my own as I don't intend to try to do any business after I sell out and I fully intend to let go this spring   I think your suggestion a good one. I think I should have the children come out here   the schools is first class and the climate is good also good society.''

45 Mont.—37

It would serve no useful purpose to again quote any substantial portion of the correspondence. It is very clear to us (1) that neither John M. Smith nor Napoleon B. Smith ever had any intention or design to defraud the children or to gain any advantage over them. Indeed, in our opinion, all of their correspondence and actions indicate a most praiseworthy solicitude for their material welfare. (2) The property was sold for its full market value and the children suffered no detriment whatsoever on account of the sale. We believe that both John M. Smith and Napoleon B. Smith acted with the utmost good faith in the premises, that they exercised sound judgment as to the affairs of the children, and constantly had in mind the fact that they were dealing with a trust estate and ought not to jeopardize it by taking any chances of its being diminished or lost while in their care. With this in mind it naturally occurred to them that an investment in government bonds was perhaps the safest that could be made. At least they appear to have had such an ultimate investment constantly in mind. (3) We think it equally clear that neither of these parties at any time pending negotiations for the sale, or at the time of the sale, had any idea that John M. Smith should buy the property as a speculation or as a permanent investment. We cannot read their correspondence or contemplate their actions and hold the opinion that either of them ever entertained any other notion than that John M. Smith, after becoming sole owner, should dispose of the entire plant at the earliest opportunity, and, · if possible, within a very few months after the sale. We think the correspondence shows, also, that they were dealing with each other at arm's-length, and we find no evidence that N. B. Smith was dominated by his uncle or influenced by him to do any act inimical to the interests of the children. It is very easy to select a fragment of one letter here, and another there, and by patching them together draw a partisan conclusion, altogether variant from the intentions and sentiments of the writers. We do not think that any of the main deductions of fact drawn by the appellant are justified in the evidence. We are also of opinion that John M. Smith's frank and repeated assertion that in his judgment the property

was of greater value than that at which the executor estimated it, in itself shows good faith on his part. (4) Neither have we any doubt that John M. Smith was honestly of the opinion that, considering the large undertaking he would be required to give, and which he eventually did give, for the faithful performance of his duties as guardian, together with his individual responsibility, and the further fact that the entire property would be speedily disposed of and the proceeds invested in government bonds, it was a perfectly legitimate transaction to employ the guardianship funds temporarily to take up the indebtedness to the Union Bank & Trust Company and thus avoid the payment of so large a rate of interest as nine per cent per annum on the sum of over $80,000. He testified that he thought he had a right to turn in the certificates in payment of his notes because he had given security; that he understood he was using money that was turned over to him as guardian but thought he had a right to do so, as he had given security, because "it was the same as though it was in my possession." He very frankly stated that he might have made a mistake but that he did not do so with intent to defraud anyone and if he had wronged anybody he was willing to make it right. He said he thought it was just the same as if he put it in government bonds if he paid the interest. We cannot believe that this old man was engaged in a fraudulent conspiracy to defraud his brother's orphan children. Moreover, the facts show that they have not been defrauded. Their property was sold to the only purchaser who could be found who was willing to give as much as $85,000, the full value thereof; and that sum, after deducting expenses of administration, has been fully paid to them. It may be that upon settlement of the guardian's accounts he should have been required to pay a greater rate of interest and for a longer period of time, than was actually required of him, but that question is not before us; and even if it should be answered in the affirmative, the fact cannot by relation characterize as fraudulent and void prior transactions which were in themselves honest and free from actual fraud.

But it is contended that the plan adopted by John M. Smith of using guardianship funds to take up his personal indebtedness to the bank was fraudulent and void as a matter of law. In this connection it may be well to note that aside from the question of the rate of interest that should have been exacted from John M. Smith as guardian, the equities of the case are all with the respondents. The appellant is attempting, in a court of equity, to overturn and set aside a purchase of property sold in good faith, for its full value, every dollar of which has been accounted for, because, as he claims, his guardian used his money for a short time, in order to effect the purchase. In fact, this consideration is of no moment whatsoever, so far as the result to the appellant is concerned. Not any of his property was embezzled or withheld. All of it was duly and regularly accounted for when he became of age, and turned over to him. During the latter years of his minority he took no chances of the sheep industry being affected by adverse legislation; he was fully protected from loss; if John M. Smith had continued to pay interest on the amounts temporarily borrowed from the bank and had allowed the guardianship funds to lie idle, or if he had sold out the entire holdings of the sheep company, as contemplated, the result to the appellant would have been exactly the same as that brought about by the course of procedure actually adopted. If the appellant had been defrauded in fact, or if he had lost anything by reason of the methods pursued by his guardian, he would be in an altogether different situation; but such is not the case.

It is claimed by the learned counsel for the appellant that in the circumstances disclosed by the record, John M. Smith was [2] guilty of larceny under the provisions of section 8656, Revised Codes, which are as follows: ''Every person acting as * * * guardian * * * who secretes, withholds or otherwise appropriates to his own use * * * any money * * * in his possession or custody, by virtue of his office, employment or appointment, is guilty of larceny.'' This section has no bearing upon the case disclosed by the record. Smith did not secrete or withhold the money of his wards. They were

in nowise aggrieved by his method of procedure. Even if we assume that he was not justified in using the funds as he did, and that he thereby technically appropriated them to his own use, yet we must look to the ultimate result of his actions in order to correctly judge of the effect thereof upon the instant controversy. It is impossible for us to believe that a guardian who had given ample security to account for all funds coming into his hands, who was personally able to raise the amount thereof on demand, who sincerely believed that he was acting legally and for the best interests of his wards, and who did, in fact, fully account for all moneys paid over to him, should or could be adjudged guilty of a heinous crime in a subsequent suit by one who has not lost or suffered by his conduct.

The particular infirmity in the case of the plaintiff is that he is attempting to avoid the sale for a purely technical reason; a reason based in facts arising after the sale was complete, and which had no effect whatsoever upon the sale itself. It is claimed that this may be done because the whole course of action was fraudulent and therefore void; that the subsequent use of his money, pursuant to a prior design to so employ it, vitiated the sale theretofore made. But his premises are defective. Not any fraud in fact was contemplated or practiced in any part of the proceedings; at most a mistake was made by the guardian as to his right to so use the money; and a technical violation of duty on his part may not now be employed to overturn a transaction otherwise regular and legal, by which no one had suffered any injury.

Two very elaborate and able briefs have been submitted by counsel for the appellant. Numerous decided cases are therein cited, all of which we have examined with painstaking care, but not any of which, in our judgment, deal with the exact question here involved. It is contended that equity must frown upon such a proceeding as that disclosed by this record, because it has a tendency to "despoil the weak wards of chancery, even though in the individual case it may have been entered upon with the most praiseworthy motives and a fair and even liberal consideration for the property was paid." But we conceive that a court

of equity, while constantly bearing in mind the beneficent fundamental principles of its jurisprudence, should carefully and conscientiously examine and decide each case upon the particular facts therein disclosed, with a view to doing substantial justice by the immediate litigants, lest in applying a hard-and-fast rule to all cases alike, injustice may be done to the parties then claiming the attention of the court. We find no occasion to unduly lengthen this opinion by a review of the cases cited.

In addition to the basic question heretofore considered, several technical points of law are advanced in behalf of the appellant and elaborately argued. Some of them are incidentally disposed of by what has already been said; the others have no merit, in our judgment. The facts of the case are against the appellant.

The judgment and order are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

Petition for rehearing pending.